# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| **KESANIA POWELL** | § | |
| | § | |
| v. | § | NO. 4:23-CV-00783-SDJ-BD |
| | § | |
| **NELNET, INC.** | § | |

## MEMORANDUM OPINION AND ORDER
## FOLLOWING SHOW-CAUSE HEARING

Mentorship is a gem of the legal profession. Experienced attorneys provide junior colleagues with important guidance, and that guidance relates to more than just substantive law and best practices for preparation and presentation of clients' cases. It extends, or at least should extend, to lessons in diligence, candor with courts, respect for opposing counsel, and other parameters of ethical conduct and professionalism. A good mentor can make a mentee's legal career soar. The absence of one can cause a career to stall or falter.

Failures of mentorship do not injure only would-be mentees. The consequences are often felt by firm management, colleagues, opposing counsel, judges, and the judicial system more broadly. As our neighboring court noted nearly four decades ago,

> litigation is conducted today in a manner far different from years past. Whether the increased size of the bar has decreased collegiality, or the legal profession has become only a business, or experienced lawyers have ceased to teach new lawyers the standards to be observed, or because of other factors not readily categorized, we observe patterns of behavior that forebode ill for our system of justice.

*Dondi Props. Corp. v. Com. Sav. & Loan Ass'n*, 121 F.R.D. 284, 286 (N.D. Tex. 1988). That observation is part of why this court has reminded all counsel who appear before it of their obligation to "demonstrate compliance with the Eastern District of Texas Local Rules, including Rules AT-3 (standards of practice to be observed by attorneys) and CV-7(h) ("meet and confer" requirement) through civility, professionalism, and candor." Davis, J., *Judge-Specific Information*, https://txed.uscourts.gov/?q=judge/magistrate-judge-bill-davis. To the extent a busy junior

attorney may overlook, or not fully appreciate, that expectation, a more experienced attorney should explain it—and lead by example.

But mentorship takes time, and in the American legal profession, time is tightly tied to money. Some law firms now charge $3,000 for just one hour of an experienced partner's time. *See* David Thomas & Mike Scarcella, *More lawyers join the $3,000-an-hour club, as other firms close in*, Reuters (Feb. 27, 2025, 3:15 PM), https://www.reuters.com/legal/legalindustry/3000-an-hour-lawyer-isnt-unicorn-anymore-2025-02-27/. Others, whose rates are much lower, saddle junior lawyers and paralegals with more cases than they can reasonably handle competently. When that workload also comes without adequate oversight by more experienced lawyers—that is, would-be mentors—problems often arise.

This case illustrates some of those problems. The parties have settled their dispute. The only questions left are whether sanctions are warranted and, if they are, what form they should take. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395–96 (1990) (explaining that the court's sanctions authority extends beyond resolution of a case on the merits). At a show-cause hearing held in April of this year, counsel for defendant Nelnet Servicing, LLC, informed the court that the parties' settlement agreement bars any fee award to Nelnet for sanctionable conduct. With a transfer of money off the table, several observations and admonishments are warranted.

## BACKGROUND

Represented by the law firm of Jaffer & Associates PLLC, Kesania Powell sued Nelnet and Experian Information Solutions, Inc., for alleged violations of the Fair Credit Reporting Act. She sought, among other things, $200,000 in damages for her alleged mental anguish.

Experian settled early. But Nelnet continued to defend itself, and during the course of the litigation, it accurately noted that Powell, one or more of her attorneys, or both had violated a court order permitting discovery, altered documentary evidence before it was produced in discovery, and needlessly increased litigation costs by advancing arguments that the court had already rejected.

The misconduct revolved around Dr. Thomas Jones, Powell's therapist, and his medical records. Nelnet requested the records in discovery based on their relevance to Powell's alleged mental anguish. Powell resisted their production and argued that the only relevant records were those created after the credit reporting at issue.

In resolving that discovery dispute, the court ruled that, because Powell claimed extensive emotional damages, Nelnet was entitled to see her medical records from before the challenged credit reporting to investigate other possible sources of her alleged mental anguish. The court ordered Jones to produce the records directly to Nelnet. Dkt. 43 at 6. It also ordered Powell to produce communications between her counsel and Jones, rejecting an assertion of privilege. *Id.* at 4.

But Powell continued to resist Nelnet's discovery efforts, and during their course, Nelnet found out that Powell had successfully directed Jones to edit the records before they were produced. Ivonne Saldana, Powell's Jaffer & Associates attorney at the time, had been licensed to practice law in Texas for only two years before the events at issue here. And Saldana knew about Powell's alteration of the records; Powell told her what she and Jones had done. Saldana produced the altered records to Nelnet despite knowing that they had been changed and in violation of the court's order that they be produced by Jones, without interference by Powell or her counsel.

Nelnet subpoenaed Jones for documents reflecting his communications with Powell's counsel. Powell, now represented by a new Jaffer & Associates attorney, Heather Hersh, filed two motions to quash the subpoena despite the court's order ruling that the communications were discoverable.

The court held a hearing on the motions to quash and the issue of the altered records. Minute Entry for Oct. 18, 2024. At the hearing, Hersh informed the court that Powell was withdrawing the motions to quash. After counsel for Powell, Nelnet, and Jones all agreed that the records had been altered, the court ordered them to determine whether the original records still existed. Dkt. 73.

Powell, Nelnet, and Jones filed a joint notice informing the court that the original electronic document containing the records could not be recovered. Dkt. 79. It is unclear whether Powell's alterations to the records or Jones's lack of technological sophistication are to blame, but the end

3

result was that the "master" file of Jones's original records was destroyed. Jones produced electronic versions of the records to Nelnet, but those files were created sometime in October 2024, long after Powell's relevant therapy sessions. Nelnet could not recover the earlier, unaltered versions. Counsel for Powell and Nelnet agreed that the loss of the original records constituted spoliation. Dkt. 79; *see Coastal Bridge Co. v. Heatec, Inc.*, 833 Fed. Appx. 565, 574 (5th Cir. 2020) (explaining that spoliation occurs when a party with an obligation to preserve evidence acts in bad faith to intentionally destroy it and that the court may impose sanctions to remedy spoliation).

Nelnet moved for sanctions, Dkt. 95, and for summary judgment. It then settled with Powell. And although it moved to withdraw its sanctions motion, Dkt. 105, it still insisted that sanctionable conduct occurred. The court ordered Powell, Saldana, Hersh, and a representative of Jaffer & Associates to appear at a hearing to show cause why they should not be sanctioned for the conduct described in Nelnet's motion. Dkt. 109.

## THE SHOW-CAUSE HEARING

Powell, Saldana, Lance Erikson (representing Saldana), Hersh, Stephen Jones (representing Jaffer & Associates), and Sabrina Neff (representing Nelnet) appeared at the show-cause hearing. Minute Entry for Apr. 15, 2025. The court gave each of them a chance to testify and present argument on the question of sanctions. Shawn Jaffer, the founding attorney and president of Jaffer & Associates (or "Jaffer Law," as it may now be known), did not attend the hearing.

Powell testified first. She stated that she asked Jones to alter her medical records because she believed they were inaccurate. She said she wanted to correct the perceived errors before the records were handed over to Nelnet. And she credibly insisted that she was not trying to hide anything or mislead the court. Indeed, she appears to have had the opposite intent—and just did not understand what was required in the litigation context.

Powell also testified to her frustrations with her attorneys. She explained that Saldana knew of her plan to correct the errors in Jones's records and did not warn her not to do so. Powell complained that she had to work with several different Jaffer & Associates attorneys and paralegals

4

during her case, that the firm was disorganized, that there were frequent miscommunications with her attorneys, and that they often gave her short deadlines to respond to their requests. She described wanting to drop her case and being told that, if she did, she could be sued (though it was not clear by whom). Powell also testified that she asked to speak to Jaffer about her problems with the firm but that her requests were denied. She described herself as a victim of Jaffer & Associates and testified that her experience in this lawsuit, which she labeled a "nightmare," has traumatized her.

Saldana, who left Jaffer & Associates and stopped representing Powell in August 2024, testified that she was aware of Powell's efforts to correct Jones's records. She believed that Powell was going to "fix" some inaccuracies. She testified that both the original and the corrected records were produced to Nelnet. She also testified that she informed Nelnet about the corrections.

Saldana's counsel argued that Saldana learned a lesson about producing evidence in discovery and that she would not make similar errors in the future. And in an exchange with the court, Saldana herself agreed that her production of the altered records was not appropriate, further indicating the lesson she had learned.

Hersh testified that, when she started at Jaffer & Associates in early September 2024, the firm's files were in disarray and deadlines were being missed. She explained that a paralegal who had worked on Powell's case also left the firm shortly after Saldana resigned. Hersh conceded that she did not exercise due diligence in reviewing the court's orders in this case. She further conceded that she filed the motions to quash the document subpoena to Jones without having read the court's order addressing the subpoenaed documents. She also testified that she was not aware that Jones's records had been altered until Nelnet's counsel told her they had been. She expressed remorse and explained that this case has been a learning experience for her.

Jones testified on behalf of Jaffer & Associates. He said that the firm was "extremely, extremely regretful" about the situation and described it as a "tragic set of circumstances." He explained that the paralegal who worked on Powell's case was let go for performance reasons a few weeks after Saldana left. He expressed his belief that Hersh worked diligently to correct problems with

5

the cases she took over. He also attributed Saldana's errors to her inexperience. And he apologized to Powell on behalf of Jaffer & Associates for the communication problems and failure to meet her expectations.

Neff testified to her belief that Powell's attorneys engaged in a campaign of obfuscation to cover up alterations to the key evidence supporting her claim for damages. But as already noted, she also explained that the settlement agreement prevented Nelnet from seeking or accepting a fee award as a sanction for the misconduct.

## THE COURT'S AUTHORITY TO IMPOSE SANCTIONS

### I. Powell's Jurisdictional Challenge

After the show-cause hearing, Powell filed, through Hersh, a document styled a "sur-reply" to Nelnet's sanctions motion. Dkt. 126. Although the 12-page document told the court, among other things, that "[f]uture misconduct should be handled through updated standing orders or local rule amendments, rather than post hoc action in resolved cases," *id.* at 7, it did not comply with the current local rules, which allow sur-replies only in response to replies and limit their length to five pages. Loc. R. CV-7(a)(2), (f).

The document's main assertion, however, was that the court lacks jurisdiction to impose sanctions at this stage. It argued that Powell's settlement with Nelnet extinguished the controversy, fully resolved the sanctions issue, and divested the court of Article III jurisdiction to impose sanctions. It cited cases explaining that a settlement ends the controversy between the parties, *see, e.g.*, *Giannakos v. M/V Bravo Trader*, 762 F.2d 1295, 1297 (5th Cir. 1985), and that the court may enforce a settlement agreement only if an independent basis for jurisdiction exists, *see SmallBizPros, Inc. v. MacDonald*, 618 F.3d 458, 463–64 (5th Cir. 2010); *Hosp. House, Inc. v. Gilbert*, 298 F.3d 424, 430–31 (5th Cir. 2002).

Contrary to Powell's contentions, the court retains jurisdiction to impose sanctions—an action that the court twice notified the parties it was considering regardless of any settlement. Dkts. 101 at 1, 109 at 2 (citing *Cooter & Gell*, 496 U.S. at 395–96). Several of the cases Powell cites confirm

that the court retains its sanctions authority even after the principal controversy has been resolved. In *Vikas WSP, Ltd. v. Economy Mud Products Co.*, for example, the Fifth Circuit explained that "a court may sanction a lawyer for misconduct, award attorney's fees, or hold parties in contempt even after dismissing a case." 23 F.4th 442, 451 (2022). The court vacated the post-settlement sanctions order in that case on two alternative grounds: the sanctions order (1) struck pleadings that had already been dismissed with prejudice and (2) did not make sufficient factual findings to support the sanctions imposed. *Id.* at 454–56. And in *Cooter & Gell*, a case that Powell also cites, the Supreme Court explained that the imposition of sanctions is not "a judgment on the merits of an action" but instead "requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." 496 U.S. at 396. That determination, the Court confirmed, "may be made after the principal suit has been terminated." *Id.*

Powell also cites *National City Golf Finance v. Scott*, in which the Fifth Circuit discussed the court's inability to undo a settlement agreement after the parties voluntarily dismissed the case. 899 F.3d 412, 415 (5th Cir. 2018). But Powell overlooks that opinion's reliance on *Qureshi v. United States*, which includes a clear refutation of her position: "That the court loses jurisdiction over the litigation does not, however, deprive the district court of its inherent supervisory powers. . . . The maintenance of the original action that occasioned the court's inquiry into [the sanctionable conduct] is irrelevant to the court's jurisdiction." 600 F.3d 523, 525 (5th Cir. 2010). To the extent that Powell's post-hearing filing challenges the court's authority to enforce the terms of the settlement, it is irrelevant. The court has not been asked to enforce the settlement; it is considering whether to impose sanctions in accordance with the authorities cited in this order and by Powell herself.

## II. The Court's Inherent Power

A court may sanction a party or her counsel based on rules, its inherent power, or both. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47–50 (1991). Several rules are relevant here. *See* Fed. R. Civ. P. 11(c), 26(g)(3), 37(b)(2), 37(e). They authorize an array of sanctions, including awarding

7

attorneys' fees, excluding evidence, and striking a claim or defense. Each rule requires different findings before the court may impose sanctions.

But as already noted, the parties' settlement agreement takes a fee award to Nelnet off the table. That agreement has significant value to Powell and her lawyers, as the fees that Nelnet could seek for the misconduct it identified exceed $50,000. *See* Dkt. 124.

The court, however, may also exercise its inherent power to "vindicate its own interests." *Ben E. Keith Co. v. Dining All., Inc.*, 80 F.4th 695, 701 (5th Cir. 2023). Those interests include maintaining the efficiency and integrity of the justice system, *Chambers*, 501 U.S. at 44, and the ethical standards that govern attorneys, *In re: Deepwater Horizon*, 824 F.3d 571, 577 (5th Cir. 2016). When the conduct of a party or an attorney wastes the court's time, the court may impose a fee to compensate the public. *Eisenberg v. Univ. of New Mexico*, 936 F.2d 1131, 1136 (10th Cir. 1991); *Magnus Elecs., Inc. v. Masco Corp. of Indiana*, 871 F.2d 626, 634 (7th Cir. 1989); *see Bullard v. Chrysler Corp.*, 925 F. Supp. 1180, 1191 (E.D. Tex. 1996) (finding "that placing even the most minimal dollar value on the Court's time, the fine imposed is proper to punish [the sanctioned attorney] for the judicial resources his conduct has caused to be expended").

That said, inherent power to sanction should be exercised "with great restraint and caution." *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996). The court should impose only those sanctions "reasonable and appropriate" to "achieve the orderly and expeditious disposition" of the court's docket. *Id.*

Imposition of sanctions under that authority requires two things: a specific finding of bad faith, and due process for the sanctioned party. *Sandifer v. Gusman*, 637 F. App'x 117, 121 (5th Cir. 2015). "Bad faith exists when a party knowingly or recklessly raises a frivolous argument." *Kennard Law P.C. v. United Airlines, Inc.*, No. 23-20430, 2024 WL 3717272, at *4 (5th Cir. Aug. 8, 2024). "[F]ailure to abide by discovery orders, combined with other evidence of a party delaying and incurring needless expenses . . . is sufficient for a finding of bad faith." *Timms v. LZM, L.L.C.*, 657 F. App'x 228, 231 (5th Cir. 2016) (per curiam) (affirming a sanction award against a party who

8

destroyed electronically stored evidence after having been ordered to make it available for inspection).

Although the court has significant leeway in crafting a sanction, it must aim to deter misconduct and impose the least severe measure that will adequately deter the sanctioned conduct. *See Jenkins v. Methodist Hosps. of Dall., Inc.,* 478 F.3d 255, 265 (5th Cir. 2007) (discussing sanctions under Rule 11). "[A]n admonition by the court may be an appropriate sanction, in instances where the attorney's sanctionable conduct was not intentional or malicious, where it constituted a first offense, and where the attorney had already recognized and apologized for his actions." *Id.*

## CONCLUSIONS AND ADMONISHMENTS

### I. Powell

Based on her and others' testimony at the show-cause hearing, the court concludes that Powell did not understand that her actions would subvert the legal process. She was just poorly advised by her counsel, who should have explained, for instance, why altering Jones's records before they were produced to Nelnet was improper, even if Powell genuinely believed that the records contained inaccurate information. Powell expressed frustration and remorse at the hearing. She will almost certainly not make a similar mistake in the future. Indeed, her testimony suggested that she will be strongly disinclined to initiate litigation again.

### II. Saldana and Hersh

Saldana and Hersh each acted recklessly in their representation of Powell. Saldana violated a court order requiring Jones, not Powell or her counsel, to produce his records directly to Nelnet. Dkt. 43 at 6. Saldana also should have known that Powell's effort to "fix" the records before they were produced was improper, and she should not have condoned that conduct. Hersh filed two motions to quash Nelnet's subpoenas for communications that the court had already ruled were discoverable. Dkts. 52, 57; *see* Dkt. 43 at 4.

As Hersh put it at the hearing, this has been a learning experience for her. The court trusts that Saldana and Hersh have both learned the importance of diligence and candor in their representation of clients. *See* Loc. R. AT-3(b); Tex. Disciplinary Rules of Prof'l Conduct R. 1.01,

9

3.03. And based on its exchange with her at the show-cause hearing, the court is confident that Saldana now understands that records may not be "fixed" before they are produced, something she should have known earlier but apparently did not. Given the circumstances of this case, the court will not impose any monetary sanction on either of them.

### III. Jaffer & Associates

The testimony at the show-cause hearing established that Jaffer & Associates failed to adequately supervise Saldana, an inexperienced attorney, and failed to provide Powell with the level of representation she reasonably expected. Jaffer & Associates and its attorneys are reminded that

> [a] lawyer shall not accept or continue employment in a legal matter which the lawyer knows or should know is beyond the lawyer's competence, unless . . . another lawyer who is competent to handle the matter is, with the prior informed consent of the client, associated in the matter.

Tex. Disciplinary Rules of Prof'l Conduct R. 1.01(a). And "[i]n representing a client, a lawyer shall not . . . neglect a legal matter entrusted to the lawyer; or . . . frequently fail to carry out completely the obligations that the lawyer owes to a client or clients." *Id.* R. 1.01(b). "A lawyer's workload should be controlled so that each matter can be handled with diligence and competence." *Id.* R. 1.01 cmt. 6.

It appears to the court that, at the time of the events at issue here, Jaffer & Associates' business model was not conducive to compliance with those standards. Jones testified that Powell's case was a frequent topic of discussion within the firm, and the show-cause hearing was presumably a recent focal point of concern. The court trusts that the attorneys and staff of Jaffer & Associates, starting with firm leadership, will take the content of this order to heart and, if they have not done so already, devise and implement measures to prevent recurrence of the problems that arose in this case. Given the "great restraint and caution" with which the court must proceed on such matters, *Nat. Gas Pipeline Co.*, 86 F.3d at 467, and the circumstances of the case, no monetary sanction will

be imposed. Conduct of the same or a similar nature in future litigation would likely warrant, at the least, a fee award of the type that the settlement agreement here foreclosed.

## CONCLUSION

It is **ORDERED** that Nelnet's motion to withdraw, Dkt. 105, is **GRANTED**, and that Nelnet's motion for sanctions, Dkt. 95, is **WITHDRAWN**.

It is **FURTHER ORDERED** that, within 30 days of the entry of this order, Jaffer & Associates (or Jaffer Law, if that is the firm's current name): (1) provide a copy of this order to every attorney and non-attorney employee of the firm; and (2) file a declaration explaining the means by which it did so.

So **ORDERED** and **SIGNED** this 4th day of June, 2025.

_____
Bill Davis
United States Magistrate Judge